No. 2017-1475

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

———————————————

ARCTIC CAT INC.,

*Plaintiff-Appellee,*

v.

BOMBARDIER RECREATIONAL PRODUCTS INC., BRP U.S. INC.,

*Defendants-Appellants.*

———————————————

On Appeal from the United States District Court
for the Southern District of Florida, No. 0:14-cv-62369, Judge Beth
Bloom

———————————————

**BRIEF FOR PLAINTIFF-APPELLEE ARCTIC CAT INC.**

———————————————

Nicholas S. Boebel
POPULUS LAW LLC
222 South Ninth Street, Suite
1600
Minneapolis, MN 55402
(612) 605-3977

*Attorneys for Plaintiff-
Appellee Arctic Cat Inc.*

March 27, 2017

# CERTIFICATE OF INTEREST

Counsel for *Plaintiff-Appellee Arctic Cat Inc.* certifies the following:

1.    The full name of every party or *amicus* represented by us is: Arctic Cat Inc.

2.    The name of the real party in interest:  Arctic Cat Inc.

3.    Parent corporations and publicly held companies that own 10% or more of stock in the party: Textron Inc.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court:

POPULUS LAW LLC: Nicholas S. Boebel

KUTAK ROCK LLP: Diane L. Peterson, Aaron A. Myers, Niall A. MacLeod

FISH & RICHARDSON P.C.: John A. Dragseth

HAGENS BERMAN SOBOL SHAPIRO LLP: Steve W. Berman, Joshua C. Benson

HARKE CLASBY & BUSHMAN LLP: Lance A. Harke; Sarah Clasby Engel and Howard Bushman

Dated:  March 27, 2017

/s/ Nicholas S. Boebel
Nicholas S. Boebel
POPULUS LAW LLC
222 South Ninth Street
Suite 1600
Minneapolis, MN 55402
(612) 605-3977

Aaron A. Myers
Niall A. MacLeod
Diane L. Peterson
KUTAK ROCK LLP
3400 RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402
Telephone: (612) 334-5000

John A. Dragseth
FISH & RICHARDSON P.C.
3200 RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402
Phone: 612-335-5070

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED CASES ...................................................1

JURISDICTIONAL STATEMENT .......................................................1

STATEMENT OF THE ISSUES ON APPEAL ......................................2

INTRODUCTION ................................................................................3

FACTUAL BACKGROUND AND STATEMENT OF THE CASE .......................4

I.    FUNDAMENTAL DIFFERENCES IN OFF-THROTTLE ACTION FOR PWC AND JET BOATS..........................................................4

II.   THE ARCTIC CAT INVENTION.................................................8

    A.    Attempts to Resolve Off-Throttle Steering in PWC ...........8

    B.    Arctic Cat's Conception and Reduction to Practice............10

III.  THE PRIOR ART—THE CHALLENGER JET BOAT (IN THE RHEAULT '938 APPLICATION) PLUS A GENERIC PWC....................13

IV.   BRP'S KNOWLEDGE OF ARCTIC CAT'S OFF-THROTTLE STEERING PATENTS .................................................................15

V.    DISTRICT COURT PROCEEDINGS ..........................................16

    A.    The *Daubert* and Summary Judgment Order ......................16

    B.    Trial .................................................................................17

SUMMARY OF THE ARGUMENT ....................................................19

STANDARD OF REVIEW ..................................................................21

ARGUMENT ......................................................................................23

I.    BRP FAILS TO PROPERLY APPLY OBVIOUSNESS LAW OR
      THE SUBSTANTIAL EVIDENCE STANDARD ........................................23

      A.    The Jury Properly Found a Low Skill Level and a Lack of
            Predictability that BRP's Evidence Never Addressed ........................23

      B.    The Scope and Content of the Prior Art Does Not Encompass
            the Arctic Cat Claims ..........................................................................27

            1.    Substantial evidence showed a skilled artisan would not
                  have known to make BRP's modification. ...............................28

            2.    By Antecedent Connections in the Claims, Breen Failed
                  to Match the Prior Art to the Last Limitation of Each
                  Independent Claim ....................................................................31

            3.    BRP Did Not Prove that the Jet Boat Docking Assistance
                  System's Engine Speed Generates "Steerable Thrust"............33

            4.    The Challenger Jet Boat and Rheault '938 Lack Obstacle
                  Avoidance Limitations ..............................................................34

      C.    Substantial Evidence Supports the Jury's Findings on the
            Differences Between the Prior Art and the Claims ............................37

            1.    The Invention and the Prior Art Were Directed to
                  Different Problems .....................................................................37

            2.    There are not a finite number of identified predictable
                  solutions to the PWC off-throttle steering problem..................38

      D.    Secondary Considerations Also Support the Jury Verdict..................41

      E.    The Jury Was Entitled to Reject BRP's Testimonial Evidence
            on Obviousness....................................................................................42

      F.    Proto-14 is Wholly Irrelevant Here......................................................44

G.    BRP's Obviousness Expert Gave the Jury Many Reasons to Reject His Testimony ......................................................46

II.    BRP FAILED TO COME FORWARD WITH RELEVANT MARKING EVIDENCE ...................................................................49

III.   THE DAMAGES AWARD WAS SUPPORTED BY SUBSTANTIAL EVIDENCE .......................................................54

A.    The Evidence Established Comparability Between OTAS and the iBR Brake .......................................................................55

1.    Using iBR to Calculate OTAS's Economic Value Does Not Violate the Book of Wisdom ...............................58

2.    The Ongoing Royalty Award Should be Affirmed...................63

IV.   EVIDENCE ALSO SUPPORTS THE JURY'S VERDICT THAT BRP WILLFULLY INFRINGED ...................................................66

A.    Substantial Evidence Supports the Jury's Verdict of Willful Infringement .........................................................................66

B.    The Jury was Properly Instructed Regarding Willful Infringement .........................................................................71

C.    The Court Properly Exercised its Discretion by Trebling Damages ...............................................................................71

CONCLUSION ...........................................................................................73

CERTIFICATE OF SERVICE .................................................................75

CERTIFICATE OF COMPLIANCE.......................................................76

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.,*
  265 F.3d 1294 (Fed. Cir. 2001) ........................................................ 23

*Am. Med. Sys. v. Med. Eng'g Corp.,*
  6 F.3d 1523 (Fed. Cir. 1993) ............................................................ 49

*Amado v. Microsoft Corp.,*
  517 F.3d 1353 (Fed. Cir. 2008) ........................................................ 63

*Apple Inc. v. Motorola, Inc.,*
  757 F.3d 1286 (Fed. Cir. 2014) .............................................. 56, 59, 61

*Arctic Cat Inc. v. Bombardier Recreational Products Inc.,*
  Nos. 16-2556, -2617 (Fed. Cir.) ......................................................... 1

*Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.,*
  776 F.2d 281 (Fed. Cir. 1985) .......................................................... 45

*AstraZeneca AB v. Apotex Corp.,*
  782 F.3d 1324 (Fed. Cir. 2015) ........................................................ 57

*Blitzsafe Texas, LLC v. Honda Motor Co.,*
  Case No. 2:15-cv-1274-JRG-RSP (E.D. Tex. Jan. 26, 2017) ............... 52

*Broadcom Corp. v. Emulex Corp.,*
  732 F.3d 1325 (Fed. Cir. 2013) ........................................................ 37

*Cable Elec. Prods., Inc. v. Genmark, Inc.,*
  770 F.2d 1015 (Fed. Cir. 1985) ........................................................ 72

*Carnegie Mellon Univ. v. Marvell Tech. Group. Ltd.,*
  807 F.3d 1283 (Fed. Cir. 2015) .................................................. 61, 62

*Crocs, Inc. v. Int'l Trade Comm'n,*
  598 F.3d 1294 (Fed. Cir. 2010) ........................................................ 42

*In re Cygnus Telecomm'ns Tech., LLC, Patent Litigation,*
  536 F.3d 1343 (Fed Cir. 2008) ........................................................ 53

# TABLE OF AUTHORITIES

**Page(s)**

*Douglas Dynamics, LLC v. Buyers Prod. Co.*,
  717 F.3d 1336 (Fed. Cir. 2013) .......................................... 63

*DSW, Inc. v. Shoe Pavilion, Inc.*,
  537 F.3d 1342 (Fed. Cir. 2008) .......................................... 50

*Finjan, Inc. v. Secure Computing Corp.*,
  626 F.3d 1197 (Fed. Cir. 2010) .................................... 58, 59

*Fortinet, Inc. v. Sophos, Inc.*,
  No. 13-cv-05831-EMC, 2015 U.S. Dist. LEXIS 140048
  (N.D. Cal. Oct. 14, 2015) .................................................. 52

*Fresenius USA, Inc. v. Baxter Int'l, Inc.*,
  582 F.3d 1288 (Fed. Cir. 2009) .......................................... 63

*Fromson v. Western Litho Plate & Supply Co.*,
  853 F.2d 1568 (Fed. Cir. 1988) .................................... 60, 61

*Golden Bridge Tech. Inc. v. Apple, Inc.*,
  No. 5:12-cv-04882-PSG, 2014 U.S. Dist. LEXIS 67238
  (N.D. Cal. May 14, 2014) .................................................. 50

*Graham v. John Deere Co.*,
  383 U.S. 1 (1966)............................................... 20, 23, 26

*Grigsby v. Reynolds Metals Co.*,
  821 F.2d 590 (11th Cir. 1987)............................................ 53

*In re Gurley*,
  27 F.3d 551 (Fed. Cir. 1994) ............................................. 30

*Halo Elecs., Inc. v. Pulse Elecs.*,
  136 S.Ct. 1923, 195 L.Ed.2d 278 (2016) ................. 68, 71, 72

*Hynix Semiconductor Inc. v. Rambus Inc.*,
  609 F. Supp. 2d. 951 (N.D. Cal. 2009)................................ 63

# TABLE OF AUTHORITIES

<u>Page(s)</u>

*i4i Ltd. P'ship v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010) ...................................................... 56, 60

*Innovention Toys, LLC v. MGA Entertainment, Inc.*,
    ___ Fed.Appx. ___, 2016 WL 4151240 (Fed. Cir. 2016)...................... 71

*Jurgens v. McKasy*,
    927 F.2d 1552 (Fed. Cir. 1991) ......................................................... 22

*In re Katz Interactive Call Processing Patent Litig.*,
    639 F.3d 1303 (Fed. Cir. 2011) ......................................................... 51

*Kimberly-Clark Worldwide, Inc. v. First Quality Baby
    Products*,
    LLC, 2013 U.S. Dist. LEXIS 61272 (M.D. Penn. Apr. 30,
    2013).................................................................................................. 53

*In re Kotzab*,
    217 F.3d 1370 (Fed. Cir. 2000) ......................................................... 31

*KSR Intern. Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007)................................................................ *passim*

*Lacks Indus., Inc. v. McKechnie Vehicle Components USA,
    Inc.*,
    322 F.3d 1335 (Fed. Cir. 2003) .................................................... 43, 45

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
    694 F.3d 51 (Fed. Cir. 2012) ............................................................. 58

*Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*,
    628 F.3d 1359 (Fed. Cir. 2010) .................................................... 43, 45

*Lindemann Maschinefabrik GMBH v. Am. Hoist & Derrick
    Co.*,
    730 F.2d 1452 (Fed. Cir. 1984) ......................................................... 27

*Lucent Technologies, Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009) ......................................................... 61

## TABLE OF AUTHORITIES

**Page(s)**

*Oracle Am., Inc. v. Google Inc.*,
No. 10-03561-WHA, 2011 U.S. Dist. LEXIS 131707 (N.D.
Cal. Nov. 15, 2011) .............................................................................. 52

*Paice LLC v. Toyota Motor Corp.*,
609 F. Supp. 2d 620 (E.D. Tex. 2009) ................................................ 65

*Paragon Podiatry Lab. v. KLM Labs.*,
984 F.2d 1182 (Fed. Cir. 1993) .......................................................... 73

*Power-One Inc. v. Artesyn Techs. Inc.*,
599 F.3d 1343 (Fed. Cir. 2010) .......................................................... 27

*Quiet Tech. DC-8 v. Hurel-Dubois UK Ltd.*,
326 F.3d 1333 (11th Cir. 2003) .......................................................... 22

*Riles v. Shell Exploration & Prod. Co.*,
298 F.3d 1302 (Fed. Cir. 2002) .......................................................... 62

*ResQNet.com, Inc. v. Lansa, Inc*,
594 F.3d 860 (Fed. Cir. 2010) ............................................................ 57

*Sealant Sys. In'l v. TEK Glob. S.R.L.*,
No. 5:11-CV-00774-PSG, 2014 U.S. Dist. LEXIS 31528
(N.D. Cal. Mar. 7, 2014) .............................................................. 51, 54

*Sinclair Refining Co. v. Jenkins Petroleum Process Co.*,
289 U.S. 689, 53 S.Ct. 736 (1933) ...................................................... 60

*Standard Oil Co. v. Am. Cyanamid Co.*,
774 F.2d 448 (Fed. Cir. 1985) ...................................................... 24, 25

*State Indus., Inc. v. Mor-Flo Indus., Inc.*,
883 F.2d 1573 (Fed. Cir. 1989) .......................................................... 63

*Telcordia Techs., Inc. v. Cisco Sys.*,
612 F.3d 1365 (Fed. Cir. 2010) .................................................... 55, 56

# TABLE OF AUTHORITIES

**Page(s)**

*Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.,*
   750 F. 2d 1552 (Fed. Cir. 1984) ........................................ 61

*Trell v. Marlee Elecs. Corp.,*
   912 F.2d 1443 (Fed. Cir. 1990) ......................................... 58

*United States v. Adams,*
   383 U.S. 39 (1966)............................................................ 28

*WBIP, LLC v. Kohler Co.,*
   829 F.3d 1317 (Fed. Cir. 2016) .................................... 34, 45

*WesternGeco L.L.C. v. ION Geophysical Corp.,*
   837 F.3d 1358 (Fed. Cir. 2016) ........................................ 71

*Wine Ry. Appliance Co. v. Enterprise Ry. Equip. Co.,*
   297 U.S. 387 (1936)......................................................... 50

## Statutes

28 U.S.C. § 1295(a)(1)........................................................ 1

28 U.S.C. §§ 1331, 1338(a) ................................................. 1

## Other Authorities

Federal Rule of Appellate Procedure 32(a)(5) ..................... 76

Federal Rule of Appellate Procedure 32(a)(6) ..................... 76

Rule 50(a)........................................................................... 19

## STATEMENT OF RELATED CASES

Bombardier Recreational Products Inc. and BRP US Inc. (collectively, "BRP") and Arctic Cat previously filed an appeal and cross-appeal, respectively, in this case. *See Arctic Cat Inc. v. Bombardier Recreational Products Inc.*, Nos. 16-2556, -2617 (Fed. Cir.). The Court dismissed those appeals October 14, 2016, for lack of jurisdiction. *Id.* (Order Dismissing Appeals (Fed. Cir. Oct. 14, 2016) (Stoll, J.)). Counsel are aware of no other case in any court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331, 1338(a). A Second Amended Final Judgment entered on January 10, 2017, Appx148-149, and BRP timely appealed. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES ON APPEAL

1.      Whether any substantial evidence supports the jury's finding that BRP did not prove, by clear and convincing evidence, that each asserted claim would have been obvious.

2.      Whether BRP came forward with evidence to establish that Arctic Cat's licensee sold a "patented article."

3.      Whether the technical, safety, and economic equivalence of the accused technology and the highly-comparable though later iBR brake technology was so different that the court could not admit it and the jury could not credit it.

4.       Whether the court abused its discretion to double the jury's damage award to account for changed circumstances since the hypothetical negotiation and BRP's continuing willful infringement.

5.      Whether BRP's undisputed early knowledge of the patents, unduly and severely delayed opinions, and stealth (but failed) efforts to buy the patents provided substantial evidence for the unanimous verdict that BRP subjectively undertook an unreasonable risk that it was infringing a valid claim, and the court's enhancement.

# INTRODUCTION

BRP presents its appeal as if there never was a trial in this case—as if the jury did not find that BRP failed in its burden to present clear and convincing evidence on the fact-bound issue of obviousness, and as if the jury did not find BRP a willful infringer. BRP also passes over Arctic Cat's evidence in favor of its own evidence, when the proper issue is whether ***any*** substantial evidence supports the verdict, not whether one might reach a different verdict by crediting BRP's evidence and BRP's attorney-created story on appeal.

That story, though, is incomplete and contrary to the evidence the jury is presumed to have credited after listening to ten days of testimony and more than 100 documentary and video exhibits. On obviousness, the jurors heard evidence that BRP's jet boat docking assistance technology would not resolve PWC off-throttle steering problems and that the art taught away from the combination—and they saw repeated short-cuts taken by BRP's expert Kevin Breen. On willfulness, they heard that BRP's decisionmakers knew about the asserted patents, were worried about them, and tried to secretly buy them. And on damages, they heard that the iBR brake and OTAS were

commercially and technologically equivalent, and that OTAS was a required feature. That is certainly substantial evidence, and BRP's invitation to have the court reweigh the evidence—particularly for issues on which it had a clear and convincing evidence burden—does not hold water.

## FACTUAL BACKGROUND AND STATEMENT OF THE CASE

## I.    FUNDAMENTAL DIFFERENCES IN OFF-THROTTLE ACTION FOR PWC AND JET BOATS

This case is about a solution to a long-standing safety concern with personal watercraft (PWC). PWC are the motorcycles of watercraft—small and light, with a central seat that a rider straddles to sit high, and steered by handlebars that can turn the craft hard with a 

Fig. 1

very small rotation (about 25 degrees to "full lock-out"). Appx192; Appx1974-1977; Appx13520; Appx13523. A PWC is powered by an internal jet impeller that directly connects to the engine, and thus spins always at engine speed to force water out a steering nozzle at the back. Appx2464-2465. Cables that connect the handlebars to the nozzle change the direction of the nozzle and water jet, forcing the PWC to yaw

and change course toward the handlebar steer, as figure 2 shows. Appx192.



Fig. 2

As automobiles are to motorcycles, so too are jet boats to PWC in many ways—*i.e.*, they have a common mode of propulsion, but the similarities end there. Jet boats use a steering wheel connected to a rack and pinion steering system that converts rotational motion to lateral motion. Appx2136-2137. And the steering wheel turns much farther before hitting lock-out—about 90 degrees in each direction (triple that of handlebars)—so that the boat is less reactive to small steering adjustments. Appx1445.

The throttle mechanisms are also fundamentally and importantly different—so that going "off-throttle" requires much greater thought and movement by the driver of a jet boat. A PWC has a finger-actuated throttle that is "biased" toward an idle position so that it snaps back simply by being released. Jet boats in contrast have levers mounted to the dashboard that stay in position even as a driver releases them and uses the steering wheel, and that must separately be gripped and moved by the driver to bring the engine back to idle—a much more

conscious action by a driver. Appx2129-2130; Appx2112-2113; Appx1276-1277.

And the vehicle dynamics are very different—critical for an invention that seeks to provide power to steer the craft in urgent situations. Jet boats are larger, wider, and heavier than PWC, allowing multiple passengers to sit inside the hull of the boat and causing more drag and faster deceleration. Appx1960; Appx2203; Appx8943. Riders also sit low and stable like in a sports car, unlike the higher position on a PWC—where fast turns can cause the craft to "bounce and throw people off." Appx2231.

The off-throttle steering problem that the jet boat prior art addressed was also very different from the PWC problem that Arctic Cat solved. In a PWC, the problem occurs when the craft is moving fast and the rider releases the throttle. The propulsion system draws little water at that point and thus has little "steerable thrust," but it has great straight-line momentum. This disequilibrium between a fast-stopping impeller and slow-stopping craft means the PWC will "coast to a stop and, while coasting,



Fig. 3

there is no turning ability" for 3-6 seconds, and the craft may hit an object in front of it even as the rider tries to turn. Appx7903; Appx192-194; Appx1486; Appx2115-2118; Appx207; Appx7561; Appx1212-1214.

In jet boats, the off-throttle problem is the inverse—*i.e.*, the boat and impeller are both moving slow, in equilibrium (*i.e.*, idle RPM and idle speed) as the boat approaches a dock, and the problem is acceleration rather than deceleration. Appx8849. As the prior art Rheault '938 Canadian application notes, in the docking assistance or low-speed steering situation, the jet boat engine speed rises to provide slight acceleration to assist in docking:

> The rotation of the steering helm assembly a given degree in a clockwise direction produces a sufficient amount of power to enable the operator of the vehicle to manage docking and careful maneuvering of the watercraft vehicle in a rightward direction.

Appx 8903 (emphasis added). Thus, the problem is not bringing a fast-moving craft under control when a throttle automatically snaps back, but instead allowing a slow-moving boat to sidle into port when a driver has reached for a dash-attached lever to idle and also turned a steering wheel. *See* Appx8849.

## II.   THE ARCTIC CAT INVENTION

### A.   Attempts to Resolve Off-Throttle Steering in PWC

The efforts to solve the PWC off-throttle steering problem were many (not a very few as BRP suggests) and inadequate. Arctic Cat's own inventors, Fred Bernier and Herman (Bud) Christopherson, worked over the "course of a number of years" with "various fins" on the hull bottom and a variety of other attempts. Appx1219. Bernier started in 1998, initially relying on "fins or rudders available in the aftermarket." Appx1220. He made various rudders, including one that attached under the PWC's center. Appx1220. And he made "a number of rudders that attached to the steering nozzle itself." Appx1220. As Bernier testified, "there were a lot of attempts with rudders" including "blow-up rudders and different things." Appx1220.

BRP too looked for various appendages to solve the PWC problem. Appx1968-1969. Richard Simard was assigned project engineer for a Cobra Active Ride Plate (CARP) project, and retired professional PWC racer Sam Spade designed and built prototypes that tried to achieve both off-throttle steering and braking by attaching an appendage to the PWC ride plate—an approach they "kept … for a long time." Appx1968.

-8-

After brainstorming over 32 concepts, BRP made seventeen prototypes with various configurations of fins, flaps, tabs, rudders, and throttle reapplication for testing. Appx1953-1956; Appx9454. On one, Proto-14, Spade reconfigured a Sea-Doo PWC with a docking assistance system that BRP has used with its commercial jet boats. Appx1956-1957. Simard testified that the steering was "pretty good" and that "[w]e were surprised"—though no specific test results remain, if any ever existed, to corroborate that testimony. Appx1960. And in any event Proto-14 is not prior art and BRP abandoned it because 1) it activated when it shouldn't; 2) it was too aggressive for the lighter craft when the PWC was in reverse (the vehicle dynamics issue); and 3) it did not work in both off-power and off-throttle situations. Appx1960. As Simard candidly admitted "what works on a jet boat may not work on a personal watercraft." Appx1960.

A pair of reports that BRP's liability experts (Kevin Breen and Robert Taylor) wrote for the Coast Guard and Society of Automotive Engineers (SAE) also pointed away from Arctic Cat's solution. Appx2208; Appx2229. A February 1999 Interim Report followed Breen's call for public submissions and a review of numerous technical papers,

issued and pending patents, and product literature. Appx7585-7586. It addressed only designs that had advanced to prototype, and despite an extensive search, located no PWC with any type of throttle reapplication. Breen admitted at trial that no one had publicly built such a PWC. Appx2336-2337. An August 1999 draft Final Report followed testing of several systems, and concluded that the jet boat throttle reapplication technology was "***clearly not designed for off-throttle steering***"—that it should ***not*** be applied to PWC in the absence of "smart engine controls," which the Report characterized as an "emerging technology" not yet sufficiently developed to the "point of application for PWCs." Appx7577; Appx2231; Appx2361-2362. In short, far from suggesting use of the jet boat approach in PWC, the Reports by BRP's own experts pointed away from it—and certainly a jury could find as much.

## B.    Arctic Cat's Conception and Reduction to Practice

Despite Coast Guard report findings, the Arctic Cat inventors shifted from fins and other structures to the inventive controlled-thrust steering system in mid-to-late 1999. They discovered, from testing, that it could work at high speed as well as low speeds—that using a single

RPM level was "adequate to make a complete turn, a 90-degree turn, at various different speeds." Appx1232. They discovered that the higher momentum at high speeds were addressed with the same RPM as low speed because "the faster [the PWC is] travelling across the surface, the more efficiently you load the pump." Appx1232. Bernier testified:

> *It was quite a – quite a surprise, actually.*

Appx1232; Appx1333-1334; Appx13502-13503.

They reduced to practice no later than August 19, 1999—initially via a prototype that used a mechanical carburetor and later a prototype that used electronic fuel injection. Appx13508-13509; Appx1234 (fuel-injected model "was definitely functioning in the December of [19]99 time frame."). By September 18, they had added "steering switches" to detect when the handlebars hit a threshold angle, so that if the throttle lever was at the idle position, the controlled thrust steering system would "would automatically bring the thrust up, bring the RPM of the engine up, increase the amount of thrust and turn the boat." Appx1233; Appx13509.

The Coast Guard then asked for a demonstration. Appx1235. On December 15, 1999, Coast Guard and Navy representatives made test

runs, and the reception was favorable. Appx1234-1237; Appx13524. Bernier was told that the prototypes were the "first time they had seen something that had a viable chance of resolving the off-throttle steering issue." Appx1237. An Arctic Cat press release at the time quoted Holmes as stating about the technology, "I like it. It's one of the most impressive innovations I've seen all year." Appx9537. Arctic Cat's CEO noted in the same press release that Arctic Cat would like to license the technology to the industry "if it could make a difference" because "we believe the concept works." Appx9539. BRP (Br. at 35) calls this "hearsay" but BRP did not object at trial, so the jury was entitled to credit it in full. Because Arctic Cat withdrew from the PWC market a couple months earlier, licensing was Arctic Cat's only way to commercialize the invention. Appx1210; Appx9539.

Arctic Cat demonstrated the prototypes to PWC makers in Spring 2000. Appx1237-1239; Appx7828. Despite the fact that BRP's representatives reported back that the Arctic Cat prototypes "worked well," BRP declined a license. Appx1436-1437.

## III. THE PRIOR ART—THE CHALLENGER JET BOAT (IN THE RHEAULT '938 APPLICATION) PLUS A GENERIC PWC

BRP's treatment of the prior art at trial was very fluid, and continues to be so on appeal. But BRP's expert made a single primary combination that is relevant to this appeal—*i.e.*, a general PWC (the Sea-Doo GTX) combined with the Sea Doo Challenger jet boat with boat docking assistance—*i.e.*, a low-speed steering system that activates once the jet boat steering wheel is turned past a particular activation point, and biases the jet boat carburetor and "increases engine speed from about 0 to about 3,000 revolutions per minute." Appx8903. Breen treated that boat as being embodied by the Rheault '938 patent application. Appx2244.

Breen talked about other references but they are not prior art for this appeal.

**Rheault '833**: The Rheault '883 Patent is a CIP of the Rheault '938 but BRP made no combination with it at trial (it was filed after Arctic Cat's inventors tested their prototype). The '833 patent adds to the Rheault '938 that the low-speed steering system can work with a PWC. Appx8962. Every '833 figure shows a steering wheel rather than handlebars. It also discusses application of the jet boat steering system

at non-zero engine and surface speed. There, it uses a pitot tube and throttle position sensor to determine, with an electronic control module, the engine speed needed to steer the watercraft for various engine and surface speed combinations. The patent describes a configuration that will "increase the opening of the throttle as the watercraft speed increases in a nonlinear fashion." Appx8963. The '833 patent is listed on the face of the '545 patent, and there is no indication the examiner did not treat it as prior art.

**Boudriau '809**: U.S. patent 6,124,809 to Pierre Boudriau describes a safety system for a marine vehicle that activates "during a turning motion." Appx8881. BRP asserted the '809 patent as an anticipatory reference against a small number of claims, and did not rely on the '809 patent as part of an obviousness combination. Its U.S. application was filed September 7, 1999, about a month after Arctic Cat's inventors had built and tested their initial prototype. The testimony regarding the meaning and applicability of the '809 patent to off-throttle steering was conflicting. Appx2943-2946. And BRP's opinion counsel was of the view that the '809 patent was not entitled to the September 7, 1999, priority date for purposes of prior art. Appx9409

n.5. Boudriau sold his patent to BRP after Kawasaki had initially approached him. Appx1595; Appx1606-1607.

**Proto-14**: This was a prototype made by BRP, not made public so as to qualify as prior art, and then abandoned. The details about it at trial came from uncorroborated testimony that the jury was entitled to reject.

## IV. BRP'S KNOWLEDGE OF ARCTIC CAT'S OFF-THROTTLE STEERING PATENTS

BRP had explicit and detailed knowledge of Arctic Cat's patents throughout the relevant time period. Despite expressing a lack of interest in Arctic Cat's off-throttle steering technology in 2000, BRP adopted the technology beginning in 2004. Appx7828; Appx1428-1429. It did this with full knowledge that Arctic Cat had obtained patent rights, and with full knowledge that these patent rights were granted over BRP's issued '833 patent. Appx9469-9471. Even so, BRP never so much as obtained an opinion of counsel on Arctic Cat's patents until seven and eleven years later (*i.e.*, one opinion letter on the '969 patent in 2011 and one on the '545 patent in 2014)—after it reintroduced the

technology on all BRP PWC. Appx1600-1602.[1] About the same time as

obtaining an opinion letter on the '545 patent, BRP engaged a third

party to contact Arctic Cat with an anonymous offer to buy the PWC

steering patents. Appx1603-1606. Arctic Cat declined the offer and filed

this suit. Appx1347-1348.

## V.    DISTRICT COURT PROCEEDINGS

### A.    The *Daubert* and Summary Judgment Order

BRP challenged Arctic Cat's disclosed experts and moved for

summary judgment on many of the same issues it raises in this appeal.

On *Daubert*, the court found the opinions sufficiently reliable and that

BRP's criticisms went to weight, not admissibility. On summary

judgment, the court found fact issues at least in inconsistencies in the

statements BRP's expert Kevin Breen made in his SAE reports and in

his testimony for this litigation (Appx36; Appx26):

> The contrast between Breen's conclusions, which
> BRP has not been able to adequately explain,

---

[1] Its prior work was handwritten notes from a recent college
graduate and Canadian patent agent who could not legally give any
opinion, and who noted that the Rheault '833 was cited on the face of
Arctic Cat's '969 patent and required "further review of file wrapper,"
though it's not clear that any such review occurred. Appx1980;
Appx9471; Appx2057-2059; Appx2048-2049; Appx2054; Appx2062-2063.

> suggests that his 2016 statement may be
> influenced by hindsight.

On marking, the district court found a split among the district courts on which party carried the initial burden of showing that patented articles were sold. The district court adopted the "better view" and tasked BRP with the initial burden of showing that the unmarked PWC Honda sold under license were covered by the patents. Appx59.

## B.   Trial

***BRP's Trial Witnesses and Positions***:  Many of BRP's witnesses had long-standing biases for BRP and other credibility problems. BRP's technical experts—Breen and Taylor—had testified for BRP in numerous PWC personal injury cases. Appx2338-2339 (Breen); Appx2452-2457 (Taylor). Breen repeatedly provided short-cut analysis, could not adequately explain the inconsistencies between his prior report and his contrary trial testimony, and added new inconsistencies like pumping his PWC credentials over almost 40 years and then refusing to acknowledge that he had more than ordinary skill in the art. *See infra*, Section I(G). Taylor used a demonstrative of OTAS functions that was inaccurate and misleading. Appx2815-2818 (Cuzzillo correcting misleading demonstrative used by BRP's expert Taylor). BRP

offered to pay an hourly fee to fact witness Fernando Garcia. Appx1842-1843; Appx3065-3067. And other BRP fact witnesses testified in ways that undermined their own credibility. *E.g.*, Appx1598-1599 (Daunais); Appx1942 (Plante).

BRP vigorously cross-examined Arctic Cat's damages and technical experts on the issues raised in BRP's unsuccessful *Daubert* motion. Both BRP and Arctic Cat introduced documentary evidence and elicited testimony through both direct and cross examination relating to BRP's obviousness allegation. BRP's evidence at trial that Honda sold a "patented article" was brief testimony from Taylor that Honda PWC included a system that was "similar" to the accused BRP OTAS system. Appx2448-49.

BRP also offered testimony that it believed the Arctic Cat claims were invalid over its jet boat docking assistance system—but it was contradictory, and didn't include testimony from BRP's director of IP when BRP began infringing, from BRP's opinion counsel, or from internal counsel that communicated with opinion counsel. The damages testimony included BRP witnesses who testified to the mandatory and

expected nature of OTAS as well as conflicting expert testimony

regarding the value of OTAS at the time of the hypothetical negotiation.

*The Jury Verdict*:  The jury credited Arctic Cat's expert and lay

witness testimony and rejected BRP's, finding each claim willfully

infringed and not invalid, finding that Honda had not sold a patented

article, and awarding the per-unit royalty opined by Arctic Cat's expert,

$102.54.

*Post-trial Motions*:  The court denied BRP's post-trial motions

for substantially the same reasons that it denied BRP's summary

judgment and oral Rule 50(a) motions. It trebled damages and then

denied BRP's motion to vacate, fully explaining the enhancement

decision. It also awarded prejudgment interest, supplemental damages,

and ongoing royalties at double the jury's per unit rate. Appx99-144.

## SUMMARY OF THE ARGUMENT

*Obviousness*:  BRP's story on appeal differs greatly from the story

at trial, which was all about repeated short-cuts by its expert Breen and

his lack of credibility. Breen as the only witness for BRP to speak on

invalidity (and lacking corroboration for much of his testimony) could

not carry BRP's clear and convincing burden and he is certainly not

enough to clear the doubly-high JMOL hurdle now. Apart from that, Arctic Cat provided substantial evidence on each *Graham* factor: 1) that the level of *ordinary* skill was low; 2) that the art taught away from using jet boat dock assist on the very different PWC obstacle-avoidance problem; 3) that low-speed docking assistance did not fix the obstacle avoidance problem; 4) that the success of Arctic Cat's approach was unexpected; and 5) that Arctic Cat's invention was praised by the Coast Guard and others, and was not predictable.

*Marking*: The court properly imposed on BRP the threshold burden of producing evidence that licensed Honda PWC were "patented articles." BRP failed at all to show that the Honda PWC met claim limitations, so the marking issue properly ended there. An unsupported and legally insufficient syllogism by BRP's liability expert and an off-hand comment by Arctic Cat's former attorney cannot save the issue.

*Damages*: The jury properly based its award on a share of BRP's profit from including OTAS, inflation-adjusted back to the date of first infringement. Arctic Cat established OTAS's value with both lay and expert testimony that OTAS and the optional brake feature of Sea-Doo personal watercraft were technologically and commercially equivalent.

BRP's attempts to license its own off-throttle steering patents for $100/unit at the date of the hypothetical negotiation further confirmed the reasonableness of the jury's $102.54 royalty. The court properly doubled the jury's per-unit royalty in its ongoing royalty award for BRP's continued willful infringement and lack of acceptable non-infringing alternatives.

***Enhanced Damages***: BRP admits (though only in a footnote) that this Court has already rejected its argument that the jury instruction on willful infringement was incorrect. Substantial evidence supported the jury's verdict that BRP undertook a substantial and unjustified risk that it was infringing a valid patent. The district court properly exercised its discretion to enhance damages based on the jury's finding of willfulness and its own detailed analysis of the *Read* factors.

## STANDARD OF REVIEW

While obviousness is a legal conclusion, it depends on many underlying facts (the level of ordinary skill, scope and content of the prior art, differences over the art, and secondary considerations), and this Court "presume[s] that the jury resolved the underlying factual disputes in favor of the verdict winner and leave[s] those presumed

findings undisturbed if they are supported by substantial evidence."
*Jurgens v. McKasy*, 927 F.2d 1552, 1557 (Fed. Cir. 1991). Viewing the
evidence "through the lens of one of ordinary skill in the art, even when
all claim limitations are found in prior art references, the fact-finder
must not only determine what the prior art teaches, but whether prior
art teaches away from the claimed invention and whether there is a
motivation to combine teachings from separate references." *Id.* at 1374-
75.[2] The burden on appeal for a patent challenger is particularly heavy
because of the heightened clear and convincing evidence standard for
obviousness.

For evidentiary rulings, this Court applies regional circuit law,
and the Eleventh Circuit reviews *Daubert* decisions for an abuse of
discretion, reversing only if they are "manifestly erroneous." *Quiet Tech.*
*DC-8 v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1339-1340 (11th Cir.

---

[2] BRP's issue statement, heading, and plea for relief ask only for
"reversal" on obviousness. BRP Br. at 4; 20; 65. BRP buries mention of
"new trial" in two fast-passing, conclusory statements that lack
argument or support. *Id.* at 21; 36. The new trial remedy is thus
waived, and at a minimum, BRP can only rely for new trial on the
arguments it made—*i.e.*, that no substantial evidence supports the
verdict. BRP says nothing about the "great weight of the evidence
standard," so Arctic Cat should not have to address it here and at
length, and certainly BRP cannot ignore it now then sandbag on reply.

2003); *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 265 F.3d 1294, 1308 (Fed. Cir. 2001).

## ARGUMENT

## I.    BRP FAILS TO PROPERLY APPLY OBVIOUSNESS LAW OR THE SUBSTANTIAL EVIDENCE STANDARD

BRP's obviousness position has three fundamental problems. *First*, it assumes that the combination of the jet boat docking assistance system and a PWC reads on Arctic Cat's claims—something never proven at trial. *Second*, it fails to address the *Graham* factors, jumping instead to selective guideposts in *KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398 (2007)—which causes it to assume obviousness through hindsight and to disregard the jury's contrary findings. *Third*, it relies on uncorroborated testimony and focuses almost entirely on its own characterizations of documentary evidence, without considering contradictory statements in those documents or other conflicting evidence and inferences.

### A.    The Jury Properly Found a Low Skill Level and a Lack of Predictability that BRP's Evidence Never Addressed

BRP on appeal ignores two fact findings the jury is implied to have made that are fatal to BRP's appeal.

-23-

**First**, the level of ordinary skill is low, yet BRP's expert Breen opined as to super-skilled people like himself and BRP's engineering team. A person of ordinary skill is one who "thinks along the line of conventional wisdom in the art and is ***not one*** who undertakes to innovate, ***whether by patient, and often expensive, systematic research or by extraordinary insights*** ...." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985).

Arctic Cat's expert Bernard Cuzzillo explained that such a person here would have either a mechanical engineering degree without work experience or no degree and a couple years of experience. Appx2833. Multiple factors supported that opinion. For example, PWC innovation moved glacially, with Breen's SAE Draft Final Report stating that "literature and patent research shows that an effort has been ongoing to develop this technology for more than three decades with little commercially viable success." Appx7575. Indeed, the few sophisticated vehicle makers at the top such as BRP, Kawasaki, Yamaha, and Arctic Cat, were far outnumbered by smaller mom-and-pop shops, as Breen noted that PWC manufacturers had volume as low as "20 units a year," and Breen sent requests under Grant 18 to 31 different companies.

Appx2163; Appx2198. And even BRP as the market leader, with resources for "patient, and often expensive, systematic research," took five years from initiation to commercialization in its CARP program to address off-throttle steering and/or braking. Appx1951-52. *See Standard Oil Co.*, 774 F.2d at 454

Breen put ***no upper limit*** on the skill level—and included in his group of "ordinary" artisans himself, with thousands of hours operating PWC and decades of PWC experience, and members of the market-leading BRP team. Appx2253; Appx2262; *see infra* Section I(G). He noted that his decades of experience gave him just "a little bit more experience" than a typical person of ordinary skill. Appx 2268-2269. A reasonable jury plainly could have accepted Cuzzillo's testimony or rejected Breen's—which, right out of the gate, sinks BRP because all Breen's opinions rested on this faulty foundation.

**Second**, BRP repeatedly tells this Court that the invention was the predictable application of a jet boat approach to PWC, but the evidence BRP cites does not support that assertion, and certainly does not support that a skilled artisan would have known it before Arctic Cat's invention. For example, BRP asserts (BRP Br. at 8; 26) without a

cite that "[t]echnologically, PWCs are almost identical to jet boats." And there is substantial evidence to the contrary—because the dynamics of applying a nudge to a lightweight, high-speed PWC with a high-seated rider are fundamentally different than those for a big, low, slow-moving boat. Bernier testified that when the Arctic Cat team realized that its technology worked on a prototype PWC, "[i]t was quite a – quite a surprise, actually." Appx1232. The same was true for BRP's team—*i.e.*, Simard, who was the point person on BRP's CARP project, testified that "[w]e were surprised" that Proto-14 was "pretty good in forward speed." As Simard himself admitted "what works on a jet boat may not work on a personal watercraft," Appx1960—an admission that runs contrary to BRP's unsupported assertions on appeal that the technologies are almost identical. Certainly the jury was entitled to conclude that Arctic Cat's inventive approach was fundamentally different to what the Challenger and '938 Rheault application were doing.

The achievement of unexpected results is a factor that has long supported non-obviousness. *See Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966). In fact, "evidence of unexpected results may be strong support for a conclusion of nonobviousness," and BRP's inability to

prove expected results certainly sinks its appeal. *See Lindemann Maschinefabrik GMBH v. Am. Hoist & Derrick Co.*, 730 F.2d 1452, 1461 (Fed. Cir. 1984) (citing *Kansas Jack, Inc. v. Kuhn*, 719 F.2d 1144 (Fed. Cir. 1983).[3]

Each of these two points is alone fatal to BRP's appeal, and this Court need go no further. But there is more.

## B.    The Scope and Content of the Prior Art Does Not Encompass the Arctic Cat Claims

BRP's simplified story is that a skilled artisan would have been motivated to move the Challenger docking assistance system to a PWC to achieve Arctic Cat's claimed invention. But the whole of the evidence—and certainly substantial evidence—belies that and shows that Breen took improper short-cuts in trying to establish obviousness.

---

[3] To the extent Proto-14 has any relevance (*see* Section I(F) *infra*), the CARP memo concluded that incorporating the docking assistance technology onto a PWC created technical, operational problems. It states that at engine speeds above 2,500 RPM, the docking assistance technology created a conflict with the reverse gate of the PWC. Appx9459. The jury was entitled to find that this conflict too established that the technology was not fully interchangeable between its use for low-speed jet boat docking assistance and high-speed PWC obstacle avoidance. *See Power-One Inc. v. Artesyn Techs. Inc.*, 599 F.3d 1343, 1352 (Fed. Cir. 2010) (noting that challenger's failure to provide plausible rationale for why prior art would have worked together supported jury verdict of nonobviousness).

### 1. Substantial evidence showed a skilled artisan would not have known to make BRP's modification.

Substantial evidence shows that a skilled artisan would have been dissuaded from the making the Arctic Cat invention. Under *KSR*, even where a combination constitutes "mere substitution of one element for another known in the field," the combination is not obvious where the prior art "warned" of "risks" of the combination. *KSR Intern. Co.*, 550 U.S. at 416 (citing *United States v. Adams*, 383 U.S. 39, 40 (1966)). In *Adams*, the Supreme Court rejected obviousness of a battery invention that substituted water for acid, and magnesium and cuprous chloride electrodes for zinc and silver chloride, because the prior art warned against the "electrodes [Adams] employed." *Id.* And the *KSR* Court found that to be a key distinction over the claims. *KSR Intern. Co.*, 550 U.S. at 416-17.

The evidence here similarly showed that a skilled artisan would have faced many problems that would have dissuaded them from using high-speed off-throttle on a PWC. As Bernier testified about his initial work involving fins and rudders, "the industry puts a lot of effort into designing their watercraft so that they hold water and they run straight…. And there's a lot of streaks and chimes on the boat in order

to accomplish that, those ribs and -- and grooves on the boat."
Appx1220-1221. He also testified that small rudders were insufficient to
overcome the tendency to go straight as the PWC slowed down, and
large rudders could cause the rider to lose control under certain
circumstances. Appx1221.

The SAE Draft Final Report, written by BRP's technical experts at
trial, warned against using the low-speed docking assistance technology
to address high-speed off-throttle steering risks. Breen testified that the
jet boat throttle reapplication system (as well as on demand rudders)
required smart engine controls because the technologies "***would be
useful only*** if they were smart or on demand, as opposed to they just
happened." Appx2231. And the Draft Final Report similarly concluded
"engine control system ***would need to account*** for speed, water
conditions, relative throttle position at throttle release, amount of
additional thrust (steer) to provide, etc. ***to be beneficial***." Appx7577.
The Draft Final Report also stated that "some additional new hazards
can be envisioned" with throttle reapplication, and noted that the
hazards did "not currently exist" because throttle reapplication in PWC
did not exist. Appx7577.

Whether in the commercial jet boat or the '938 Canadian patent application, BRP's docking assistance does not incorporate "smart" or "on-demand" engine controls. This is, of course, not a problem for low-speed docking assistance throttle reapplication where activation only occurs after deliberate, non-intuitive, non-panic responses, *i.e.*, manually manipulating an unbiased throttle to idle and turning a steering wheel with a 90-degree turn radius to the full-lock position. But stability and finer control were perceived to be a real problem for lightweight fast-moving PWC with high-riding users, which "would bite and start to bounce and throw people off" when turned at high speed. Appx2231; *see In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994) ("A reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference or would be led in a direction divergent from the path that was taken by the applicant."). Substantial evidence supported the jury's implied finding that this was not a case where "a patent 'simply arranges old elements with each performing the same function it had been known to perform' and yields no more than one would expect from such an arrangement." *KSR*, 550 U.S. at 417.

Cuzzillo also countered Breen in stating that jet boat docking
assistance would "not necessarily" provide off-throttle steering to a
PWC. Appx2878. Coupled with Bernier testimony, Breen's admissions
and contradictions, and the SAE reports, the jury could reasonably
conclude as a factual matter that there was a teaching away.

## 2. By Antecedent Connections in the Claims, Breen Failed to Match the Prior Art to the Last Limitation of Each Independent Claim

In addition to showing a motivation to combine, a patent
challenger must show that the combination matches to the claim
language. *In re Kotzab*, 217 F.3d 1370 (Fed. Cir. 2000) (must show
"desirability of making the specific combination that was made by the
applicant."). BRP used Kevin Breen for this, but he missed by using
short-cuts. For all the claims, he ignored connections that the claims
explicitly require so as to over-simplify his analysis. For example, '545
claim 15 first recites its structural components—e.g., a "lever mounted
on said steering mechanism and biased toward an idle position"—and
then uses a wherein clause to recite operation of those components—*i.e.*,
"steerable thrust" is provided "after ***said lever*** is positioned other than
to provide a steerable thrust and after the steering mechanism is

positioned for turning the watercraft." The "said lever" is the snap-back throttle on the PWC handlebars—and is most definitely *not* the dash-mounted lever of a jet boat. Yet Breen wholly ignored that antecedent connection, and opined that the Challenger jet boat ***all by itself*** disclosed the wherein clause for each independent claim.[4] That allowed Breen to skip the thorny issue of having to explain to the jury precisely how those on-dash pieces from the Challenger jet boat and on-handlebar pieces from the GTX PWC would fit together,[5] and to keep insisting that he was only "interested in sort of the under-the-hood part of the jet boat." Appx2263-2264. But it means he never met his burden on this point either. Whatever can be said for the jury strategy of simplification, it kills BRP on this point.

---

[4] Appx2258-59 ('545 claim 15); Appx2287 ('545 claim 13, stating that they "are met by the jet boat"); Appx2292-2293 ('969 claim 15 ("That [the last limitation] is met by the way the throttle reapplication device on the jet boat functions.").

[5] Breen simply made a high-level swipe, saying market forces and other factors would motivate a combination of the references, but he did not explain how that combination would teach the last limitation of each independent claim because he assumed improperly—by ignoring the antecedent—that the jet boat disclosed it all.

### 3. BRP Did Not Prove that the Jet Boat Docking Assistance System's Engine Speed Generates "Steerable Thrust"

The BRP jet boat system ran at only 3000 RPM and not necessarily steerable thrust. Appx1404-1405. BRP argues to the contrary based on a comment by Arctic Cat's expert, Kamen, that he was surprised and favorably impressed that the accused OTAS technology worked as well at it did at just 18 percent of available thrust. Appx1404-1405. But any assertion that such a comment indicated steerable thrust from the jet boat is inconsistent with the video record of Kamen's testing (which was before the jury), that showed the accused OTAS technology operated at closer to 4,500 RPM, as Cuzzillo explained a little later. Appx1466-1468. The jury was entitled to find, as is likely the case, that Kamen simply misremembered the OTAS RPM level in his initial comment. BRP put on no other evidence to link the Rheault '938 and jet boat docking assistance RPM to the claimed "steerable thrust" limitation—and it bore the burden.

### 4. The Challenger Jet Boat and Rheault '938 Lack Obstacle Avoidance Limitations

BRP relied at trial on the Rheault '938 and Challenger jet boat essentially interchangeably, describing the former as the patent application on the latter. Appx2244.[6]  Rheault '938 ***describes itself*** as a "Low Speed Steering System" to "enable the operator of the vehicle to manage docking and careful maneuvering of the watercraft vehicle." Appx8904. It also emphasizes carburetor "biasing" and does not disclose any embodiment that's applicable to a fuel injected engine.[7] Appx8917. And it explains its novelty over the prior art as low-speed related:

> [N]one of the [prior art] patents disclose a means for controlling movement of the watercraft vehicle at low speeds by means of activating and controlling the carburetor and the air-fuel mixture being supplied to the carburetor.

---

[6] The '833 patent is different because it was filed a week after Arctic Cat's reduction to practice, so not surprisingly, BRP did not present it in a suggested combination. *See WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, n.2 (Fed. Cir. 2016) (noting importance of a party challenging a jury verdict on appeal to "make explicit their analysis as to the combination of references on which they rely, as well as the asserted reason(s) to combine them.").

[7] Bernier testified that his fuel-injected prototype required that various additional parts be "machined." Appx1234.

Appx8916. The Challenger operator's manual likewise describes the "docking assistance" feature as: "Whenever the throttle levers are in idle position and the steering wheel is approaching the end of its rotation, *one engine* will be *slightly accelerated* to increase the jet pump thrust and thus improving the steering control for docking." Appx8849 (emphasis added).

Simard testified that a CARP project purpose was "to improve steering but without acceleration, more with deceleration." Appx1969. And BRP's experts recognized in 1999 "[s]teering and maneuvering capabilities for PWC are excellent ***during the first and last phase of the deceleration sequence***." Appx7561. Because jet boats are heavier than PWC and have a manual throttle and a 90 degree turn radius to full lock of the steering wheel, jet boats will both 1) slow down more quickly than PWC ***and*** 2) take longer to activate the docking assistance system than with PWC. Thus, the jury was entitled to find that when tested as part of Grant 18, the jet boat showed some off-throttle steering because it was activating toward "the last phase of the deceleration sequence." Appx7561.

But the Court's construction of "after" and "upon" require the controlled thrust steering system to activate "immediately," as opposed to "the last phase of the deceleration sequence." Appx3025-3026; Appx7561. And claim limitations allowing such immediate activation are specifically recited in the asserted claims of the Arctic Cat patents: a biased throttle lever and PWC handlebars with narrow turning range, as opposed to a throttle requiring a manual move to idle and a steering wheel with a broader turning range.

The jury reasonably found that the Challenger and Rheault '938 did not disclose the controlled-thrust steering claimed by Arctic Cat— *i.e.*, that activates "immediately" and is intended for high-speed obstacle avoidance during the disequilibrium phase of PWC deceleration. Whether labeled as BRP's "docking assistance" technology or "low speed steering assistance," BRP's technology was distinguishable from Arctic Cat's patents and the jury logically concluded as much.

### C.    Substantial Evidence Supports the Jury's Findings on the Differences Between the Prior Art and the Claims

#### 1. The Invention and the Prior Art Were Directed to Different Problems

A factfinder may base a determination that an invention was not obvious on a fact finding that the invention addressed a different problem than that addressed by the prior art. *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1334 (Fed. Cir. 2013). Substantial evidence here showed that the problem PWC makers faced in 1999—obstacle avoidance at high speeds—differed materially from the problem addressed by the Challenger boat—low-speed docking assistance. At high speeds, there is the great physical dichotomy between the high momentum of the craft and the low momentum of the impeller—but it was the Arctic Cat inventors who discovered that the pump could nonetheless move the high-momentum craft sufficiently because "the faster [the PWC is] travelling across the surface, the more efficiently you load the pump"—which "surprise[d]" the Arctic Cat team and also "surprised" the BRP team. Appx1232; Appx1960.

To try to bridge this gap, BRP asserts (BRP Br. at 7) that the BRP "patent and application themselves disclose[]" that the jet boat system

could help avoid obstacles at high speeds"—but the evidence BRP cites says no such thing. BRP first cites testimony from Breen saying he tested the jet boat at up to 40 MPH, but that doesn't speak to whether the result would transfer to a PWC or if it was predictable **before** the testing such that a hypothetical skilled artisan would have seen it as addressing the high-speed PWC problem. *See* Appx2206-2207; Appx2233. The Rheault '938  patent passage to which BRP points simply talks about **engine** speed, and not the craft's speed—making BRP's citation misleading at best. Appx8920(8:7-11).[8]  And the passage BRP cites in the '833 patent was new matter added via CIP after Arctic Cat's reduction to practice of its first prototype, so it is not relevant. Appx8956(1:25-27).

## 2. There are not a finite number of identified predictable solutions to the PWC off-throttle steering problem

To match this case to *KSR* sound bites, BRP insists there were a mere few possible options available to solve the PWC problem in 1999.

---

[8] BRP also says (BRP Br. at 11) "Proto-14 achieved its goal of avoiding obstacles at high speeds," but the cryptic summary table (Appx9460-9461) BRP cites doesn't support that assertion, and certainly the jury was not required to read it as such.

But BRP never proved that, and the evidence is contrary to what BRP says to this court.

First, no witness stated that the solutions identified at trial were the only solutions. And BRP's Plante admitted that, even to this day, BRP has not undertaken to determine what the alternatives to Arctic Cat's inventive approach are. Appx1931-1933; Appx1443. BRP seeks (BRP Br. at 2; 25) to cram all the numerous solutions into two broad categories of solutions—"appendages and throttle reapplication"—but this is a gross oversimplification, the law looks for the number of solutions and not the number of broad categories of solutions, and the jury was certainly entitled to reject a characterization like BRP makes now.

Moreover, the evidence actually showed a broad range of solutions. There were "various fins" and "a variety of other things tried over a course of a number of years," Appx1221, "right in the center of the boat that was working underneath the boat," Appx1220, "a number of rudders that attached to the steering nozzle itself," "blow-up rudders and different things."

BRP's characterization also grossly oversimplifies the problem and its solutions. Numerous factors multiplied the possible responses, including the specific design of the appendage (tabs, rudders, angle, pivot, length and width, drag, *etc.*), Appx1955-1957; whether the design should also attempt to help brake the PWC; and for throttle reapplication, mapping RPM to surface speed and other conditions as reflected in the Draft Final Report. Appx7577.

BRP's own development effort reflects this complexity. Simard testified to BRP's initial efforts to provide both enhanced steering and braking in a single system. Appx1968 ("that first system was providing steering and braking both at the same time."); Appx9454 ("After 3 months of development we pushed that concept aside."). Later, an internal BRP "brainstorming" session identified 32 potential designs to address off-throttle steering and/or braking. Appx9454. And BRP developed 17 separate prototypes for on-water testing in a project that took BRP, with all of its resources, five years to complete. Appx1951-1952. This stands in sharp contrast to *KSR*, where the only question was substitution of one element for another and the result of the substitution was entirely predictable.

### D.    Secondary Considerations Also Support the Jury Verdict

Because BRP failed to provide clear and convincing evidence of obviousness in the first instance, there was no need for secondary consideration evidence, but Arctic Cat had that too.

Arctic Cat's invention satisfied a "long-felt need"—namely, the off-throttle steering problem and the increasing number of PWC accidents. BRP defies credibility with its argument (BRP Br. at 35) that before Arctic Cat's invention, BRP had already satisfied the long-felt need for a PWC off-throttle steering system with its jet boat technology. The SAE Draft Final Report directly refutes that assertion, noting "an effort has been ongoing to develop this [off-throttle steering] technology for more than three decades with little commercially viable success." Appx7575. It was undisputed that ***neither BRP nor anybody else had publicly demonstrated or sold a working throttle reapplication system for a PWC*** before Arctic Cat's invention. Appx2337.

The invention was also met with praise. The Chief of the Coast Guard's Office of Boating Safety, who led its off-throttle steering effort, stated (after riding Arctic Cat's prototypes) that it was "one of the most impressive innovations I've seen all year." Appx9537. The attendees at

the demonstration were "very impressed with the system and how it worked," and "said that it was the first time they had seen something that had a viable chance of resolving the off-throttle steering issues." Appx 1236-1237. That type of praise—particularly from leaders in the field—further cements the jury's verdict. *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1311 (Fed. Cir. 2010).

As yet another indicia, the invention includes advantages that no one even envisioned for a decade. Specifically, the control parameters it cares about are the same ones BRP's more recent iBR braking technology cares about. BRP's counsel even admitted in opening "it's a very simple thing to make it [the iBR control logic] control the engine for OTAS"—simplicity that led BRP to infringe. Appx1202; Appx1516-1518. This additional hidden feature (not even known by the inventors or anyone else) further objectively establishes the value of the invention.

### E.   The Jury Was Entitled to Reject BRP's Testimonial Evidence on Obviousness

BRP's obviousness appeal hinges on Breen's testimony. As an initial matter, it is irrelevant whether Breen supported BRP because

the issue now is whether any substantial evidence does not support BRP.

Even apart from that, the testimony gives BRP no help on appeal for at least two reasons. First, the jury was entitled to reject any testimony from Breen because of his bias and lack of credibility. *See infra* Section I(G). Indeed, the jury was twice instructed explicitly—and without objection from BRP—that it could reject in whole or in part the testimony of any witness that it found to lack credibility. Appx1126; Appx3017-18.

Moreover, the jury had to reject and is presumed to have rejected invalidity testimony that was not independently corroborated. *Lacks Indus., Inc. v. McKechnie Vehicle Components USA, Inc.*, 322 F.3d 1335, 1349 (Fed. Cir. 2003); *see also Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*, 628 F.3d 1359, 1373-75 (Fed. Cir. 2010). BRP drips such testimony throughout its brief Jackson Pollock-like, without corresponding documentary support, so the Court must be very vigilant on this point, but any citations to Appx1207 and Appx2992 (the range for the transcript) that do not also have a documentary citation must be

viewed with extreme skepticism[9]. In sum, the story BRP tells this Court on obviousness might have been proper before the jury, but it is not on appeal.

### F.    Proto-14 is Wholly Irrelevant Here

BRP provides deep color to its story by relying on its Proto-14 device. Whatever it was, there is no dispute it was ***not prior art***. So right out of the gate, its relevance is merely evidence of supposed contemporaneous invention. But even that melts in view of the implied fact findings that flow from the jury verdict, for at least three reasons.

**First**, the jury could reject contemporaneous invention made by ***super-skilled*** artisans. And the BRP team—members of the engineering team for the world's largest PWC maker—certainly could not have been more super-skilled.[10]

---

[9] BRP's particular characterizations of the prior art are also often unsupported by the evidence BRP cites.  For example, BRP asserts (BRP Br. at 28) that Dr. Cuzzillo admitted the split cable system in the Arctic Cat's patents was "'just like' the Challenger's cable," when in fact he indicated nothing more than that he understood it was like the non-prior art Proto-14 cable.  See Appx2881-2882.

[10] The team included former professional racer Sam Spade, a person who "knew everything about personal watercraft." Appx1950-1951; Appx1569 ("Sam was a technician in Florida, a development technician, and he was also an inventor because he was very creative gentleman.").

**Second**, as a secondary consideration it was then the jury's role to determine how much weight to give to Proto-14, and the jury could give it no weight. *See WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1331 (Fed. Cir. 2016); *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 306 (Fed. Cir. 1985).

**Third,** and perhaps most important, the jury could reject any testimony not tied to documentary corroboration. *See Lacks Indus., Inc.*, 322 F.3d at 1349; *Lazare Kaplan*, 628 F.3d at 1373-75. Importantly, BRP got most of its description of Proto-14—and all of the color for its story on appeal—from that testimony. For example, BRP cites (BRP Br. at 10-11) only to testimony from Plante for the centerpiece of its Proto-14 story—*i.e.*, that in the Proto-14, "BRP simply took the cable that had been connected to the steering wheel system on the Challenger and connected it to the handlebar steering system on a PWC." Appx1911. Without corroboration, the jury was entitled to conclude that was untrue, and this Court must reject it as false (though again, BRP presents the statement now as if it was undisputed). And the central document on Proto-14 is sparse at best—showing an unintelligible table

where BRP on appeal asserts boldly that "Proto-14 achieved its goal of

avoiding obstacles at high speeds." Appc9460-9461.[11]

Proto-14, which BRP abandoned in any event, Appx2850, cannot

carry BRP's case in any manner at all.

### G.    BRP's Obviousness Expert Gave the Jury Many Reasons to Reject His Testimony

BRP used Kevin Breen to carry all its water on obviousness, yet

his testimony was peppered with short-cuts and incredible

statements—such that the jury could altogether reject him and BRP's

case. The court instructed the jury pre-trial, without BRP objection,

that "You may believe everything a witness says, part of it, or none of

it" and "you may take into account … any bias or prejudice the witness

may have."  Appx1126. Post-trial, it instructed specifically on experts,

again without objection, that the jury should "consider the possibility of

bias" for paid experts "and should view with caution the testimony of

---

[11] BRP discusses Proto-14 as if it were complete but the CARP memo calls it merely "interesting" and has "good efficiency," but provides no details as to what that means. There is no geometry for a test course and no information about the degree of off-throttle steering. At trial, BRP did not show the jury any version of Proto-14 (whether original or re-built for trial) and put no evidence linking its RPM level to the required steerable thrust.

such witness *where court testimony is given with regularity and*

*represents a significant portion of the witness' income*."

Appx3017-3018.

Breen hit all these points and more. He's testified for BRP so often

he can't even remember the number—"probably" more than 20, and

"maybe" even more than 30.  That includes two other still-pending

snowmobile cases against Arctic Cat. Appx2338-2339. This was more

than an expert being compensated for his time; it was a regular

career—a captured witness. Many of his opinions at trial also lacked

any credibility—for example, he provided a drive-by on enablement that

never even mentioned "undue experimentation"—which BRP doesn't

even defend on appeal. Appx2310-2313. He tried to paper over

fundamental inconsistencies between his SAE Reports and his trial

testimony, and he skipped over claim requirements so that he could

make his obviousness arguments more easily—both discussed above.

Perhaps Breen's most incredible testimony—and most readily

understandable as incredible to a juror—was a sudden about-face on his

own skill level. In a classic "credentials march," he noted that he

(Appx2144-2160; Appx2192):

- was "director of the marine and automotive research group," overseeing 10 people for 15 years;

- did similar work on his own for 11 years, and "the same type" elsewhere "for 13 years" before that—39 years in this field;

- has engineering bachelors and masters and is a licensed engineer;

- did ealy-1980s work on "how quickly people respond and had steered in emergency situations";

- was "personally familiar" with PWC and had ridden them "thousands" of hours;

- had done "various types of [professional] testing" on PWC back to the 1980s;

- had "conducted research that relates to what type of standards ought to be involved in [PWC]";

- worked in a "broad area" of PWC design and testing for "a number of companies"—which included using a machine shop in his office;

- was a 20-year member of the committee that writes PWC standards;

- has developed product labels for the industry;

- had a "significant" role on the SAE J2608 standard for off-throttle steering;

- co-authored the Grant 18 reports;

- has testified as an expert in dozens of PWC cases;

- even owned a prior art Challenger jet boat at the time of invention.

And yet he insisted that he was nothing more than an artisan of

***ordinary*** skill—another short-cut to make easier his task of decreeing

Arctic Cat's claims invalid.[12]  Appx2253. In fact, when asked point

blank whether he had ***ordinary*** skill or ***extraordinary*** skill, he

refused to admit it was extraordinary and said that his "30 years" gave

him just "a little bit more experience" than a regular person of ordinary

skill. Appx 2268-2269. Certainly the jury could drop its collective jaw at

this sudden transformation from Mr. PWC to Barney Fife, and—along

with his other problems and his regular work for BRP—could have

entertained the thought of "shill" rather than independent expert, a

thought that, at the very least, cannot be labeled as unreasonable.

## II.    BRP FAILED TO COME FORWARD WITH RELEVANT MARKING EVIDENCE

Although a patentee has the burden to show that patented goods

were marked, district courts split on which party must come forward

with evidence that any products required marking. *Am. Med. Sys. v.*

*Med. Eng'g Corp.*, 6 F.3d 1523, 1537-39 (Fed. Cir. 1993).

The evidentiary burden here is properly controlled by

practicalities and by the purpose of the statute. The purpose is to avoid

---

[12] Experts typically admit they are super-skilled, and then explain how they can opine as someone of ordinary skill (*e.g.*, by looking through the eyes of their colleagues or students).

punishing an infringer who may have seen an unmarked product in commerce and been lulled into thinking it can make a similar product without liability. *E.g., DSW, Inc. v. Shoe Pavilion, Inc.*, 537 F.3d 1342, 1348 (Fed. Cir. 2008) ("The purpose of the notice requirement is to provide 'protection against deception by unmarked patented articles.' … The idea is to prevent innocent infringement."); *Wine Ry. Appliance Co. v. Enterprise Ry. Equip. Co.*, 297 U.S. 387, 394 (1936) (same). Because the statutory purpose focuses on what a competitor like BRP believes (whether actually or constructively), it makes sense to place on the competition the initial burden of identifying that a product existed in the wild that might create such a false impression.

This makes logical sense apart from the statutory purpose. If the patentee bore the burden, it would have to make an initial showing that *every* licensee product did not practice the patent—and because it bears the burden of persuasion, it would need to make a detailed and convincing showing. That is a near-impossible burden with a global conglomerate like Honda.[13]  It would be even harder in fields like

---

[13] "[A]bsent guidance, the universe of unmarked, marketed goods with the potential to trigger Section 287 'would be unbounded.'" *Golden Bridge Tech. Inc. v. Apple, Inc.*, No. 5:12-cv-04882-PSG, 2014 U.S. Dist.

microprocessors and software where it is much more difficult to "see" the technology in products and to match claim language to the products. And BRP is simply wrong that a licensor has a superior position to identify such products—*i.e.*, licensors are seldom friendly with those extracting a fee from them.

The same problems do not inure if the accused infringer bears the initial burden. They can discuss as little as one unmarked product line, since the law requires substantially complete marking—*i.e.*, they don't have to address every product a licensee makes or even every product that practices the patent. *See In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1311 (Fed. Cir. 2011) (allocating burden of production to party "in the best position to narrow the dispute"). And the level of effort they have to expend is much smaller in relation, because their facts must be believed if reasonable. In the hypothetical event that a member of the public cannot determine whether a

---

LEXIS 67238, at \*35 (N.D. Cal. May 14, 2014); *Sealant Sys. In'l v. TEK Glob. S.R.L.*, No. 5:11-CV-00774-PSG, 2014 U.S. Dist. LEXIS 31528, at \*31 (N.D. Cal. Mar. 7, 2014) ("Absent guidance from the other side as to which specific products are alleged to have been sold in contravention of the marking requirement, a patentee … is left to guess exactly what it must prove….").

licensee's product practices the patent, an accused infringer can obtain

discovery to the same extent a patentee can, and in any event, the

concerns that underlie the marking statute would not even be in play—

*i.e.*, there would no danger that a member of the public would be lulled

into thinking the invention was free to practice when they couldn't even

see it.

These are the reasons the district court used the "better view" to

place the burden. Appx59. And although BRP says it takes the

"majority" viewpoint, the clear trend is to the contrary, particularly

among courts with great expertise in patent litigation like the Northern

District of California and the Eastern District of Texas.[14] There, the

process is two-step: (a) the defendant establishes that the patent holder

or licensee sold a "patented article," then (b) Section 287 is triggered

---

[14] *See, e.g., Fortinet, Inc. v. Sophos, Inc.*, No. 13-cv-05831-EMC, 2015 U.S. Dist. LEXIS 140048, at *16 (N.D. Cal. Oct. 14, 2015); *Oracle Am., Inc. v. Google Inc.*, No. 10-03561-WHA, 2011 U.S. Dist. LEXIS 131707, at *10-11 (N.D. Cal. Nov. 15, 2011). BRP's string cite includes two E.D. Tex. cases, but that court recently adopted the "better view." *See Blitzsafe Texas, LLC v. Honda Motor Co.*, Case No. 2:15-cv-1274-JRG-RSP, at 3 (E.D. Tex. Jan. 26, 2017) ("Therefore, Defendants have the initial burden of showing that there was a product that practiced the patents-in-suit.").

and the patentee has to persuade the fact-finder that it complied with the statute.

BRP failed in its burden of coming forward. For all time, this Court has required across all legal issues that a party seeking to match a claim to a product must perform an "all limitations" analysis. The requirement is central and unwavering in the doctrine of patent law. It is an element of a basic *prima facie* case, and in all areas, a party disposes of a burden of production by coming forward on each element of a *prima facie* case. *E.g., Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 594 (11th Cir. 1987); *In re Cygnus Telecomm'ns Tech., LLC, Patent Litigation,* 536 F.3d 1343, 1355-56 (Fed Cir. 2008) (party with burden of production must set forth "specific facts"). BRP is thus wrong that it simply had to "identify," by name, unmarked products that "may" practice the claims—because that in no way satisfies the necessary elements of showing that the claims read on those products.[15] The

---

[15] *E.g., Kimberly-Clark Worldwide, Inc. v. First Quality Baby Products*, LLC, 2013 U.S. Dist. LEXIS 61272, at *20 (M.D. Penn. Apr. 30, 2013) (defendant triggered by its expert "***test[ing] 14 packages of [licensee] P&G diapers*** . . . none of which bore the [plaintiff KC's] Patent number, and Goldman concluded that these products practiced at least claim 1 of the [KC's] Patent."

district court here concluded after hearing BRP's expert's testimony that "there is virtually no evidence at all that Honda is, or ever did, sell any kind of patented article"—nor was the evidence better before the jury. Appx75; Appx3001; Appx3006-3007.[16]  The district court and the jury made no errors.[17]

## III.  THE DAMAGES AWARD WAS SUPPORTED BY SUBSTANTIAL EVIDENCE

BRP's request to vacate the damages award is fundamentally flawed. The law simply requires comparability between OTAS and iBR, substantial evidence supports their technological and economic comparability, and BRP cites no law for a *temporal* comparability requirement or facts to suggest that the relevant issues changed over

---

[16] Taylor's testimony had no factual support and was a conclusory assertion that if BRP's OTAS infringes, then Honda's PWC must be a patented article because the "Honda system is very similar to OTAS," along with a single demonstrative slide explaining why he believed the Honda PWC *were not* patented articles. Appx2447-2448. BRP's reference to Olds is similarly lacking. Appx2676 (noting after watching a video or seeing an advertisement that a Honda PWC "seemed to have a controlled-thrust steering system. That's as far as I know.").

[17] *See Sealant*, 2014 U.S. Dist. LEXIS 31528, at *112-13 (defendant failed to clear it burden with conclusory expert testimony and a demonstrative exhibit that a product was sold that looked "like a product embodying the … patent.").

time here. The district court did not abuse its discretion, and the jury's royalty is almost identical to BRP's offer to license its '833 patent to Kawasaki at the time of the hypothetical negotiation. Appx2748-2751; *see Telcordia Techs., Inc. v. Cisco Sys.*, 612 F.3d 1365, 1377-79 (Fed. Cir. 2010) (this Court gives "broad deference to the conclusions reached by the finder of fact" on damages determinations).

## A. The Evidence Established Comparability Between OTAS and the iBR Brake

BRP's overstates the differences between OTAS and the iBR brake. The record reflects only two meaningful differences: 1) the iBR brake is manually activated via handlebar finger lever, 2) iBR uses a reversing bucket and reverses thrust. Appx1516-1518.

BRP's development history established the close relationship of the approaches. As far back as CARP, BRP considered addressing steering and braking with a single system. Appx1968. While BRP had an ongoing internal discussion, Simard believed enhanced steering was the ***more*** critical safety advance. Appx1968-1969.

Arctic Cat presented evidence that both were important safety features. Appx1402-1403. Cuzzillo testified that because the primary difference between them is that OTAS acts as a "passive safety system,"

the OTAS and brake systems are equivalent and each adds

substantially to PWC safety. Appx1516-1518.

When activated, both provide thrust to the PWC, provide off-throttle steering, and safety benefits. *Id.*; Appx13510; Appx13512. That comparability is sufficient under this Court's precedent. *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1316 (Fed. Cir. 2014) (reversing exclusion of damages expert testimony because comparability between a touchscreen and a touchpad was sufficient where both "detect[ed] finger contacts and translate[d] them into computer commands"); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 854 (Fed. Cir. 2010) (products that are substitutes in the market are comparable). This is doubly true where BRP itself examined braking and off-throttle steering systems as substitutes for one another during the CARP program. Appx1968-1969.

The link to economic equivalence was also well supported. BRP asserts (BRP Br. at 48), without support in economic theory or legal precedent, that because baseline PWC costs includes OTAS, the technology grew *less* valuable. BRP has it backward—*i.e.*, a necessary technology is more valuable than an optional technology, and Plante admitted that BRP had not even investigated whether it could switch to

another technology. Appx1931-1933; Appx1443; *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1334–35 (Fed. Cir. 2015) ("[I]f avoiding the patent would be difficult, expensive, and time-consuming, the amount the infringer would be willing to pay for a license is likely to be greater.").

Both technologies are in Sea-Doo PWC, but even where the optional iBR brake feature is not included, OTAS is. Appx1624. BRP relies on OTAS to comply with the mandatory J2608 off-throttle steering standard. Appx1434; Appx1443. BRP testified that OTAS was a "point of entry" into the PWC marketplace, akin to floating. Appx1616; Appx1619; Appx1625 ("if a consumer turn the steering right, he's expecting turn right. In his mind, it's no more complicated than that. That's an expectation…. They are expecting the watercraft will float."). Bratic considered this testimony and further explained why the baseline feature was more valuable than the optional feature. Appx1741-1742. Bratic's use of the optional iBR brake system as a benchmark was both conservative and well supported.

BRP's cited cases miss the mark because they address comparability between licenses. *ResQNet.com, Inc. v. Lansa, Inc*, 594

F.3d 860 (Fed. Cir. 2010) (excluding noncomparable license agreements entered under radically different circumstances); *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012) ("When relying on ***licenses*** to prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice."); *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1211-12 (Fed. Cir. 2010) ("…past patent licenses … must account for differences in the technologies and economic circumstances"). Strict comparability is required there because licenses might prejudicially be interpreted as a ***substitute for the hypothetical negotiation itself***. *Trell v. Marlee Elecs. Corp.*, 912 F.2d 1443, 1446 (Fed. Cir. 1990). For the more limited purpose of benchmarking economic value, the evidence at trial established sufficient technological and commercial comparability under this Court's deferential standard of review.

### 1. Using iBR to Calculate OTAS's Economic Value Does Not Violate the Book of Wisdom

BRP seeks a bright-line rule to exclude consideration of iBR under the Book of Wisdom, but no such rule exists nor should this case create it.

**First**, a valuation benchmark need not be independently temporally comparable. While the passage of time *may* cause variations in circumstances, it can also be informative as long as the expert accounts for time-based differences. *Finjan, Inc.*, 626 F. 3d at 1211. Bratic took account of that difference and inflation adjusted the value back to the date of the hypothetical negotiation. Appx1673-1675. And BRP does not even identify any fundamental change in the market during that time period that would undercut his analysis so badly it must be rejected; rather, BRP simply repeats (BRP Br. at 53) that iBR had not been invented yet—but that does not by itself answer the question of whether it was a fair comparable.

In *Apple Inc. v. Motorola, Inc.*, this Court found that the expert's selection of a benchmark could be challenged as a matter of fact, but that threshold comparability had been established where both "detect[ed] finger contacts and translate[d] them into computer commands." 757 F.3d at 1316. As this Court stated "[f]actually, if the Trackpad is not an accurate benchmark, Motorola is free to challenge the benchmark or argue for a more accurate benchmark. But such an argument goes to evidentiary weight, not admissibility…." *Id.* at 1319;

*see also i4i Ltd. P'ship*, 598 F.3d at 853-54 (sufficient comparability where benchmark provided functionality that was otherwise unavailable without infringement). This Court has not and should not impose an additional requirement of temporal comparability.

**Second**, permissible post-negotiation data under the "Book of Wisdom" is properly as flexible as the damages inquiry itself. To the extent Bratic relied on such data, he testified that he followed the "book of wisdom." Appx1650; *Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568, 1575-76 (Fed. Cir. 1988). The Supreme Court itself held that events postdating the hypothetical negotiation represent a "book of wisdom that courts may not neglect" and that no rule of law "sets a clasp upon its pages, and forbids us to look within." *Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 698, 53 S.Ct. 736, 739 (1933). This Court has confirmed that the hypothetical negotiation is a flexible construct that "permits and often requires a court to look to events and facts that occurred thereafter and ***that could not have been known to or predicted by the hypothesized negotiators***." *Fromson*, 853 F.2d at 1575.

Numerous admissible methodologies exist to calculate a reasonable royalty. *Apple*, 757 F.3d at 1315 ("a party may use the royalty rate from sufficiently comparable licenses, value the infringed features based upon comparable features in the marketplace, or estimate the value of the benefit provided by the infringed features by [] comparing the accused product to non-infringing alternatives."). The book of wisdom similarly allows resort to post-negotiation data in appropriate circumstances depending on the damages model.[18]

Bratic's model focused on value willing negotiators would have given OTAS in August 2004. Appx1674-1675. The comparable but after-developed iBR brake technology provided the baseline value, which

---

[18] *Carnegie Mellon Univ. v. Marvell Tech. Group. Ltd.*, 807 F.3d 1283, 1303-04 (Fed. Cir. 2015) (noting post-negotiation data regarding "significant . . . industry-wide" usage of invention in support of per-unit royalty); *Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F. 2d 1552, 1568 (Fed. Cir. 1984) (finding error in the exclusion of evidence of infringer's profit as relevant to "effect of [using] the patented specialty in promoting sales of other products of the licensee"); *Fromson*, 853 F. 2d at 1578 (a reasonable royalty could be "a percentage of the dollar amount of profit made by the infringer from its use of the invention, whatever that dollar amount may have from time to time been."); *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1333-34 (Fed. Cir. 2009) ("quantitative information, assuming it meets admissibility requirements, ought to be given its proper weight, as determined by the circumstances of each case.").

Bratic inflation-adjusted to the hypothetical negotiation date.
Appx1673-1674. Bratic's methodology was sound, proper, and a
"reasonable approximation" of the hypothetical negotiation—
particularly in light of the evidence of OTAS's superior value and the
lack of any relevant change in the market over that time. *Carnegie*, 807
F.3d at 1304 (noting that "reconstruction of the hypothetical
[negotiation] . . . does not require 'mathematical exactness,' but a
'reasonable approximation' under the circumstances").

BRP's reliance on *Riles v. Shell Exploration & Prod. Co.* is
misplaced. 298 F.3d 1302 (Fed. Cir. 2002); BRP Br. at 50, 54. The three
challenged damages models there were based on data not tied to the
patented technology. *Id.* at 1312-13 ("[all three] models reflected
Mr. Dry's assessment of the worth of Shell's oil rig at the time of
trial . . . [the models did not] reflect[] what the parties might have
agreed to, at any time, particularly at the time the infringement
began."). *Riles* does not even mention the book of wisdom. BRP's
running theme that the hypothetical negotiators had to "expect" or
"predict" post-negotiation events is incorrect.

## 2. The Ongoing Royalty Award Should be Affirmed

The award and amount of ongoing royalties are "committed to" the court's "sound discretion." *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1364 n.2 (Fed. Cir. 2008). BRP's challenge here (BRP Br. at 55) rests on the flimsy foundation that the amount "must" allow the infringer to earn a "reasonable profit." But even *before* a judgment of infringement and validity "[t]here is no rule that a royalty be no higher than the infringer's net profit margin." *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1580 (Fed. Cir. 1989); *see also Douglas Dynamics, LLC v. Buyers Prod. Co.*, 717 F.3d 1336, 1346 (Fed. Cir. 2013).

The jury's reasonable royalty verdict provides the ongoing royalty baseline. *Amado*, 517 F.3d at 1364 n.2. District courts view this Court's "guidance [that a] post-verdict infringement should entail a higher royalty than the reasonable royalty found at trial." *Hynix Semiconductor Inc. v. Rambus Inc.*, 609 F. Supp. 2d. 951, 987 (N.D. Cal. 2009). The ongoing royalty analysis is based on the modified *Georgia-Pacific* analysis, though accounting for post-judgment changed circumstances. *Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1303 (Fed. Cir. 2009).

The changed circumstances here favor an increase . The court specifically found that *Georgia-Pacific* factors 5, 8, 9, and 11 supported an increase. Appx140. And the factors BRP identifies in its Brief also support an increase. In 2004, OTAS was legally optional, though important (much like the iBR brake after 2009), but in 2016, BRP had for years included it in its entire PWC line. Appx1411; Appx1821; Appx1916 (noting J2608 went into force in 2006); Appx3529-3530; Appx3538. BRP has not implemented an OTAS alternative to comply with the J2608 standard, and has not even investigated any alternatives. Appx1931-1933; Appx1443. And if BRP failed to agree to a license post-judgment, it faced a new suit with even higher damages and trebling. Appx141-142.

These facts are unchanged by Bratic's opinion on splitting the profit between BRP and Arctic Cat ***in 2004***. Because Arctic Cat was no longer selling PWC, their desire to leave substantial profit with the infringer to ensure continued royalty payments at the first hypothetical negotiation was logical, as Bratic testified. Appx1640; Appx1669-1670. But the circumstances after BRP has deployed OTAS in willful derogation of Arctic Cat's patent rights across its entire PWC product

line for years is entirely different. *Paice LLC v. Toyota Motor Corp.*, 609 F. Supp. 2d 620, 626-27 (E.D. Tex. 2009) (explaining that in assessing ongoing royalty, "Toyota never considers the fact that its continued infringement is willful and that a new lawsuit…would likely result in treble damages."). Whatever others' behavior in the marketplace, the record amply supports ***BRP's*** need to continue infringing Arctic Cat's patents in 2016. Appx140.

The district court also addressed BRP's contention that it was entitled to earn a profit on its willful infringement. Appx141. BRP failed to establish that it could not continue to earn a profit on OTAS by simply adjusting its pricing to account for the royalty obligation. Appx141 (citing *Paice*, 609 F. Supp. 2d at 627-28 ("However, Toyota controls its pricing as well as its conduct; if Toyota's hybrid vehicles are no longer profitable, it can choose to cease its infringing conduct or simply pass increased production and material costs along to the consumer.")). BRP's proposed rule of law that it "must" be permitted to earn a profit from its willful infringement is misguided.

## IV. EVIDENCE ALSO SUPPORTS THE JURY'S VERDICT THAT BRP WILLFULLY INFRINGED

As with the other bases for its appeal, BRP's request to reverse or vacate the willful infringement and enhancement decisions simply ignores the bases for the findings against it. Neither the jury in its willfulness finding, nor the district court in its enhancement decision were required to draw inferences in BRP's favor, or to view its witnesses as credible. And neither did. This does not, however, mean that the jury lacked substantial evidence or the district court abused its discretion.

### A. Substantial Evidence Supports the Jury's Verdict of Willful Infringement

The trial record in this case contains a good deal more than BRP's story of its supposed "good-faith infringement." The jury heard evidence, for example, that BRP (1) had notice of Arctic Cat's pending patent rights before any patent ever issued, Appx7828; (2) learned of the patents shortly after each issued, Appx1554; and (3) from the very beginning, was aware that the patents issued over the '833 patent describing the jet boat technology that, at trial, BRP claimed made the Arctic Cat patents invalid. Appx9471. The evidence showed that BRP advised Arctic Cat that it would be pursuing an off-**power** solution for

steering (which it did for a while) and thus would not need a license for Arctic Cat's off-***throttle*** steering technology, but never advised Arctic Cat when its plans changed and it started to incorporate off-throttle steering into its PWC. Appx7828. Abandoning its off-power options in favor of Arctic Cat's off-throttle solutions, BRP knowingly infringed the patents ***for years*** without an opinion of counsel on infringement or validity. Appx1601-1602.

Years later, and several years after BRP reintroduced the infringing technology across its PWC product lines—as BRP prepared to sue Arctic Cat on other matters and expected retaliation—BRP finally sought an opinion of counsel. Appx1600-1604. But it used an attorney closely-tied to BRP's litigation, rather than obtaining an opinion that was more reasonably independent. Appx1550-1551; Appx1600-1601. The jury listened as witnesses were asked whether its opinion counsel, Harry Marcus, was told about the extent and duration of BRP's use of the patented technology; no one knew. Appx1601-1602. Perhaps the jurors wondered if the opinion letters were simply for "cover." Perhaps they wondered why Marcus and BRP's Yves St. Arnaud, the person who actually spoke to Marcus on the subject, did not testify. Indeed, in the

jurors' minds, this may have been underscored by the fact that St. Arnaud was present in the courtroom throughout the trial. Appx1602-1603.[19]

BRP hangs much of its willfulness defense on the testimony of Fernando Garcia (BRP Br. at 58-59), who says he drew certain conclusions about Arctic Cat's technology as compared to BRP's jet boat technology. But he never claimed to review Arctic Cat's patents or applications, or even be privy to any such analysis. This, BRP places entirely on the shoulders of Dominic Goudreault—then a recent college graduate and new in-house patent agent at BRP who testified that he reviewed the '969 patent and '545 patent application in 2004 and concluded that they were invalid. Appx1980; Appx2025.

The jury saw the evidence of Goudreault's "analysis"—a few hand-scribbled notes that stated that "need further review of file wrapper" and "6,336,833 was cited." Appx9469; Appx9471. It heard Goudreault

---

[19] Arctic Cat submits that, under *Halo*, an accused infringer cannot "reasonably rely" on an opinion letter that is obtained 7-11 years after the date of first infringement. *Halo Elecs., Inc. v. Pulse Elecs.*, 136 S.Ct. 1923, 1933, 195 L.Ed.2d 278 (2016) ("[C]ulpability is generally measured against the knowledge of the actor at the time of the challenged conduct").

admit that he reviewed five pending claims from the '545 patent but never reviewed the 31 issued claims of the patent. Appx2057-2059; Appx2048-2049; Appx2054; Appx2062-2063. They listened as Goudreault acknowledged that, as a patent agent, he was not permitted to give an opinion on patent infringement or validity, Appx2040-2041, but that he knew that the fact the '833 patent was cited on the face of the '969 and '545 patents meant that that the examiner considered that art and concluded that the patents-in-suit were new and different from anything claimed therein. Appx2049; Appx2062-2063.

Perhaps BRP's claims about its "good faith" reliance on Goudreault's "analysis" rang hollow with the jury from the quality of the "analysis" itself, or perhaps from the fact that the actual decision-makers from BRP never testified. BRP's brief points twice (BRP Br. at 59-60) to then-Director of IP Jonathan Cutler, who—it says— "agreed the patents were invalid" and "reasonably determined that Arctic Cat's patents were invalid." Cutler, however, never testified in the case, even though he is alive and well and practicing law in a law firm in Montreal with Goudreault. Appx1989-1991; Appx2064-2065. Perhaps the jury wondered if the fact that more than half of Goudreault's work still came

from BRP—more than $800,000 in fees per year—at all affected Goudreault's credibility. Appx2064.

Perhaps the jury winced when it heard that—around the time BRP finally obtained an opinion on the '545 patent—it engaged a third party, attorney Ron Laurie, to anonymously buy the Arctic Cat watercraft patents. Appx1600-1606. And while BRP argues that this "had nothing to do with their actual importance or value," the one decision-maker who did testify at trial, BRP's Jean Daunais, testified that BRP devised the plan to buy Arctic Cat's watercraft patents (and not any Arctic Cat snowmobile, engine, or ATV patents), specifically because it was worried that it infringed (Appx1604-1606):

> **Q.** And the reason you didn't try to buy any of those patents is because you didn't think BRP infringed those patents, right?
>
> **A.** Well, that's difficult to say. I would say yes.
>
> **Q.** Okay. But you did try to buy Arctic Cat's watercraft patents?
>
> **A.** Correct.

Actual evidence beats attorney argument, the record shows BRP's willful infringement, and the jury reasonably drew its inferences in Arctic Cat's favor to find willful infringement.

## B.    The Jury was Properly Instructed Regarding Willful Infringement

For the instruction, BRP's arguments also fall flat. This Court has squarely rejected the argument that *Halo* altered the *Seagate* standard for subjective willfulness. *WesternGeco L.L.C. v. ION Geophysical Corp.*, 837 F.3d 1358, 1362 (Fed. Cir. 2016). Far from failing to appreciate *Halo*'s holdings, as BRP contends, the Court in *WesternGeco* specifically affirmed the "known-or-should-have-known" standard of *Seagate*:

> *Halo* emphasized that subjective willfulness alone—i.e., proof that the defendant acted despite a risk of infringement that was " '***either known or so obvious that it should have been known*** to the accused infringer,' " *Halo*, 136 S.Ct. at 1930 (quoting *Seagate*, 497 F.3d at 1371)—can support an award of enhanced damages.

*Id.* (quoting *Halo*, 136 S.Ct. at 1930 (quoting *Seagate*, 497 F.3d at 1371)) (emphasis added); *see also Innovention Toys, LLC v. MGA Entertainment, Inc.*, ___ Fed.Appx. ___, 2016 WL 4151240 at *2 (Fed. Cir. 2016). BRP is simply wrong here.

## C.    The Court Properly Exercised its Discretion by Trebling Damages

"Egregiousness" does come into play under the Court's exercise of discretion for enhancement. And in this case, as the district court explained in denying BRP's motion to vacate on this issue, "treble

damages were awarded after comprehensive—perhaps, painstakingly so—consideration of the particular circumstances of this case." Appx103-104.

The district court had already examined the nature of BRP's conduct on several occasions and detailed its findings before it decided enhancement. Even post-judgment, and despite its earlier findings, it revisited the issue again, to "ensure that the Court's decision in which it trebled damages comports with the Supreme Court's new guidance" in *Halo*. Appx101-102.

In its denial of BRP's motion to vacate the enhancement award, the district court scrupulously addressed each *Read v. Portec* factor and concluded that its earlier decision to treble damages was correct. Appx115 ("Ultimately, *Read* factors 1, 2, 4, 5, 6, 7, and 9 compellingly support the Court's decision to treble damages."). While BRP may disagree with certain findings, it cannot point to an abuse of discretion on the basis of this record. Even as to the issue of copying, BRP cannot (and does not) deny that it had access to Arctic Cat's prototypes and adopted a strongly similar use—a combination that can give rise to a "strong inference of copying." *Cable Elec. Prods., Inc. v. Genmark, Inc.*,

770 F.2d 1015, 1027 (Fed. Cir. 1985). That the district court viewed the evidence differently is not an abuse of discretion. *See, e.g., Paragon Podiatry Lab. v. KLM Labs.*, 984 F.2d 1182, 1191 (Fed. Cir. 1993). The enhancement decision should be affirmed.

## CONCLUSION

The decisions of the jury and district court should be affirmed.

Dated: March 27, 2017                    Respectfully submitted,

                                         */s/ Nicholas S. Boebel*
                                         Nicholas S. Boebel
                                         POPULUS LAW LLC
                                         222 South Ninth Street
                                         Suite 1600
                                         Minneapolis, MN 55402
                                         (612) 605-3977

                                         Aaron A. Myers
                                         Niall A. MacLeod
                                         Diane L. Peterson
                                         KUTAK ROCK LLP
                                         3400 RBC Plaza
                                         60 South Sixth Street
                                         Minneapolis, MN 55402
                                         Telephone: (612) 334-5000

                                         John A. Dragseth
                                         FISH & RICHARDSON P.C.
                                         3200 RBC Plaza
                                         60 South Sixth Street
                                         Minneapolis, MN 55402
                                         Phone: 612-335-5070

                                         *Attorneys for Plaintiff-*
                                         *Appellee Arctic Cat Inc.*

# CERTIFICATE OF SERVICE

I hereby certify that, on this 27th day of March, 2017 I filed the foregoing Brief of Plaintiff-Appellee Arctic Cat Inc. with the Clerk of the United States Court of Appeals for the Federal Circuit via the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

Dated:  March 27, 2017

/s/  *Nicholas S. Boebel*
Nicholas S. Boebel
POPULUS LAW LLC
222 South Ninth Street
Suite 1600
Minneapolis, MN 55402
(612) 605-3977

Aaron A. Myers
Niall A. MacLeod
Diane L. Peterson
KUTAK ROCK LLP
3400 RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402
Telephone: (612) 334-5000

John A. Dragseth
FISH & RICHARDSON P.C.
3200 RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402
Phone: 612-335-5070

## CERTIFICATE OF COMPLIANCE

Counsel for Plaintiff/Cross-Appellant Arctic Cat Inc. hereby certifies that:

1.      The brief complies with the type-volume limitations of Federal Rule of Appellate Procedure because exclusive of the exempted portions it does not exceed 13,920 words.

2.      The brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Word 2016 in a proportionally spaced typeface: Century Schoolbook, font size 14 point.

DATED:  March 27, 2017

/s/  *Nicholas S. Boebel*

Nicholas S. Boebel
POPULUS LAW LLC
222 South Ninth Street
Suite 1600
Minneapolis, MN 55402
(612) 605-3977

Aaron A. Myers
Niall A. MacLeod
Diane L. Peterson
KUTAK ROCK LLP
3400 RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402
Telephone: (612) 334-5000

John A. Dragseth
FISH & RICHARDSON P.C.
3200 RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402
Phone: 612-335-5070